| | | |
|---|---|---|
| Approved: | _____<br>JANE YUMI CHONG<br>Assistant United States Attorney | **23 MAG 4186** |

Before:  THE HONORABLE GABRIEL W. GORENSTEIN
        United States Magistrate Judge
        Southern District of New York

---

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>                v.<br><br>SANDEEP GROVER and<br>SHIKHA SEHGAL,<br><br>                            Defendants. | **SEALED COMPLAINT**<br><br>Violations of 18 U.S.C. §§ 1028A, 1031, 1349, and 2<br><br>COUNTY OF OFFENSE:<br>NEW YORK |

SOUTHERN DISTRICT OF NEW YORK, ss.:

KENNETH HOSEY, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation, and charges as follows:

**COUNT ONE**
(Major Fraud Against the United States)

1.      From in or about April 2020 through at least in or about June 2021, in the Southern District of New York and elsewhere, SANDEEP GROVER and SHIKHA SEHGAL, the defendants, knowingly executed, and attempted to execute, a scheme and artifice with the intent to defraud the United States, and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, in a grant, contract, subcontract, subsidy, loan, guarantee, insurance, and other form of Federal assistance, including through an economic stimulus, recovery and rescue plan provided by the Government, the value of which was $1,000,000 and more, to wit, GROVER engaged in a scheme to obtain more than $13 million in Government-guaranteed loans by means of false and fraudulent pretenses, representations, and documents, for more than 100 companies controlled by GROVER and/or the putative clients of GROVER's tax preparation firm, including SEHGAL, through loan programs of the United States Small Business Administration (the "SBA") designed to provide relief to small businesses during the COVID-19 pandemic, namely the Paycheck Protection Program (the "PPP").

(Title 18, United States Code, Sections 1031 and 2.)

## COUNT TWO
(Conspiracy to Commit Wire Fraud and Bank Fraud)

2. From at least in or about April 2020 through at least in or about June 2021, in the Southern District of New York and elsewhere, SANDEEP GROVER and SHIKHA SEHGAL, the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343, and bank fraud, in violation of Title 18, United States Code, Section 1344.

3. It was a part and an object of the conspiracy that SANDEEP GROVER and SHIKHA SEHGAL, the defendants, others known and unknown, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, GROVER and SEHGAL agreed to and did participate in a scheme to fraudulently obtain loans guaranteed by the United States government for more than 100 companies controlled by GROVER and/or the putative clients of GROVER's tax preparation business, including SEHGAL, through the PPP by means of false and fraudulent pretenses, representations, and documents.

4. It was further a part and an object of the conspiracy that SANDEEP GROVER and SHIKHA SEHGAL, the defendants, and others known and unknown, knowingly would and did execute, and attempt to execute, a scheme and artifice to defraud a financial institution, as that term is defined in Title 18, United States Code, Section 20, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such a financial institution, by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344, to wit, GROVER and SEHGAL agreed to and did participate in a scheme to fraudulently obtain loans guaranteed by the United States government for more than 100 companies controlled by GROVER and/or the putative clients of GROVER's tax preparation business, including SEHGAL, from banks insured by the Federal Deposit Insurance Corporation through the PPP by means of false and fraudulent pretenses, representations, and documents.

(Title 18, United States Code, Section 1349.)

## COUNT THREE
(Aggravated Identity Theft)

5. In or about June 2020, in the Southern District of New York and elsewhere, SANDEEP GROVER, the defendant, knowingly transferred, possessed, and used, without lawful authority, a means of identification of another person, during and in relation to a felony violation enumerated in Title 18, United States Code, Section 1028A(c), to wit, GROVER used the name and identity of another person during and in relation to the major fraud against the United States and conspiracy to commit wire fraud and bank fraud violations charged in Counts One and Two

of this Complaint.

(Title 18, United States Code, Sections 1028A(a)(1), (b), and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

6. I am a Special Agent with the FBI. This affidavit is based upon my personal participation in the investigation of this matter, my interviews of witnesses, and my examination of financial records and other documents. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## Overview of the Scheme

7. SANDEEP GROVER, the defendant, is a tax preparer. GROVER owns Excellent Business Services Inc. ("EBS"), an accounting and tax preparation business based in Seaford, New York. GROVER is also the sole or partial owner of numerous other companies. GROVER used EBS to perpetrate a fraud scheme resulting in the disbursement of more than $13 million[1] in PPP loan proceeds to his own companies and to the companies of putative EBS clients.

8. As further detailed below, from at least in or about April 2020 through at least in or about June 2021, SANDEEP GROVER, the defendant, doing business as EBS, submitted or assisted in submitting applications to at least seven FDIC-insured financial institutions (the "Banks") in order to fraudulently obtain PPP loans on behalf of more than 100 companies, and then used the loan proceeds for impermissible purposes. Specifically:

   a. The loan applications were submitted on behalf of (i) companies in which SANDEEP GROVER, the defendant, or his wife held an ownership interest (the "Grover Companies"), or (ii) companies owned by putative EBS clients (the "Client Companies"). Most of the Grover Companies and Client Companies did not report to the Social Security Administration ("SSA") or the New York State Department of Labor ("NYDOL") that they had paid any wages during the relevant time period of 2019 through the first half of 2021.

   b. The loan applications indicated that the businesses were located in various counties in New York, including counties in the Southern District of New York; contained false statements regarding, among other things, the number of employees and average monthly payroll; and were submitted with fake IRS Form 940s (Employer's Annual Federal

---

[1] GROVER also obtained additional loans totaling approximately $6 million in PPP loan proceeds for dozens of companies that did report having paid wages to the SSA or NYDOL in the relevant time period. The term "Grover Companies" is used to refer to those companies owned at least in part by GROVER and which submitted PPP applications despite reporting no payroll or wages to the SSA or NYDOL, or payroll and wages substantially different from what was reported in the PPP applications.

Unemployment (FUTA) Tax Returns) and IRS Form 941s (Employer's Quarterly Federal Tax Returns) prepared by EBS.

        c.      Records obtained from Bank-1 show that in connection with loan applications submitted on behalf of the Grover Companies and Client Companies, PPP loan proceeds were disbursed in, among other places, the Southern District of New York. In response to fraudulent activity, Bank-1 closed at least three personal bank accounts held in the names of SANDEEP GROVER, the defendant, and his wife, and at least a dozen accounts held in the names of the Grover Companies and Client Companies, on the same day, May 21, 2021.

        d.      Based on information from the SBA, I have learned that all PPP forgiveness applications were processed through a server located in Oregon, and the forgiveness payments from the SBA were primarily processed in Virginia.

    9.      Based on my review of PPP loan applications and bank records, and my interviews with several putative EBS clients, I am aware that SANDEEP GROVER, the defendant, used a variety of methods to apply for PPP loans. In some cases, he applied for PPP loans on behalf of certain Client Companies without the clients' authorization, by using the clients' personally identifiable information, fabricating invoices, and forging their signatures. Other putative EBS clients, including SHIKHA SEHGAL, the defendant, assisted GROVER in his scheme by creating new company bank accounts for his use in connection with the loan applications; by providing false statements or fabricated documents regarding their companies' employees and payrolls for submission to the Banks; by making phone calls to lending platforms seeking information regarding the status of their loan applications; or by assisting GROVER in completing loan paperwork.

    10.      Based on my review of records for bank accounts belonging to the Grover Companies and the Client Companies, I have learned that instead of using the PPP loan proceeds for allowable loan recipient payroll costs, mortgage interest, rent, and/or utilities, SANDEEP GROVER, the defendant, used a substantial portion of the $13 million in PPP loan proceeds they received for impermissible purposes, such as paying expenses owed by companies other than the loan recipients; purchasing property; and paying off personal loans. To facilitate these activities, tens of thousands of dollars at a time were withdrawn from the accounts to which the loans had been disbursed and moved into other bank accounts held by the Grover Companies and the Client Companies.

## SBA Lending in Response to COVID-19

    11.      Based on my training and experience, my review of information from the SBA's website, my review of information received from the SBA, and my communications with SBA employees, I know that:

        a.      The SBA is a federal agency of the Executive Branch that administers assistance to American small businesses. This assistance includes guaranteeing loans that are issued by certain lenders to qualifying small businesses. Under the SBA loan guarantee programs, the actual loan is issued by a commercial lender, but the lender receives the full faith and credit backing of the United States Federal Government on a percentage of the loan. Therefore, if a borrower defaults on an SBA-guaranteed loan, the commercial lender may seek

reimbursement from the SBA, up to the percentage of the guarantee. By reducing the risk to commercial lenders, the SBA loan guarantee programs enable lenders to provide loans to qualifying small businesses when financing is otherwise unavailable to them on reasonable terms through normal lending channels. When a borrower seeks an SBA-guaranteed loan, the borrower must meet both the commercial lender's eligibility requirements for the loan as well as the SBA's eligibility requirements.

    b. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act is a federal law enacted on March 27, 2020 designed to provide emergency financial assistance to the millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other business expenses through the PPP. On April 24, 2020, the Paycheck Protection Program and Health Care Enhancement Act was signed into law, authorizing over $300 billion in additional PPP funding.

    c. The PPP allows qualifying small businesses and other organizations to receive unsecured SBA-guaranteed loans with a maturity of two years and interest rate of one percent. PPP loan proceeds must be used by businesses on payroll costs, mortgage interest, rent, and/or utilities. The PPP allows the interest and principal to be forgiven if businesses spend the proceeds on these expenses under certain conditions. Pursuant to the CARES Act, the amount of PPP funds a business is eligible to receive is determined by the number of employees employed by the business and their average payroll costs. Businesses applying for a PPP loan must provide documentation to confirm that they have in the past paid employees the compensation represented in the loan application. The PPP is overseen by the SBA, which has authority over all PPP loans, but individual PPP loans are issued by approved commercial lenders who receive and process PPP applications and supporting documentation, and then make loans using the lenders' own funds. Eligibility for PPP loans was limited to businesses in existence before on or about February 15, 2020.

    d. Borrowers through the PPP were also eligible to apply for loan forgiveness once all loan proceeds for which forgiveness was requested had been used.

### The Grover Companies and Client Companies

  12. From my review of PPP loan applications submitted to the Banks on behalf of the Grover Companies and records for bank accounts opened in the names of the Grover Companies, I am aware of the following:

    a. Between in or about April 2020 through at least in or about June 2021, SANDEEP GROVER, the defendant, signed and submitted at least 22 first-round and second-round PPP loan applications on behalf of at least 15 companies for which he certified that he was the 100 percent owner or a partial owner, and none of which reported to the SSA or NYDOL having paid wages to employees in 2019 or 2020.

    b. Approximately four loans to the Grover Companies were forgiven by the SBA.

5

   c. The names of many of the Grover Companies are derivations of "SAMRIDH" or "SAMRDH." For example:

| Borrower | Loan Disbursements |
|---|---|
| SAMRIDH LLC | $122,700 |
| SAMRIDH 1 LLC | $42,850, $42,850 |
| SAMRIDH 3 LLC | $48,480 |
| SAMRIDH 5 LLC | $79,262 |
| SAMRDH 7 LLC | $78,875 |
| SAMRIDH 9 LLC | $88,951, $88,949 |
| SAMRDH 11 LLC | $81,037 |
| SAMRDH 12 LLC | $95,700 |
| SAMRDH 19 LLC | $85,900, $85,900 |
| SAMRDH 21 LLC | $72,800, $72,800 |
| SAMRIDH 33 LLC | $102,617 |
| SAMRIDH 35 LLC | $103,072 |

  13. From my review of PPP loan applications submitted to the Banks on behalf of the Client Companies and records for bank accounts opened in the names of the Client Companies, I am aware of the following:

   a. Approximately five loans to the Client Companies were forgiven by the SBA.

   b. Many of the putative EBS clients are the owners of multiple companies that submitted PPP loan applications.

  14. From my review of PPP loan applications submitted on behalf of SANDEEP GROVER, the defendant, and the Client Companies, I know that GROVER and the Client Companies sought and obtained PPP loans based on false, substantively similar representations about their loan eligibility. For example, from my review of PPP loan applications submitted to Bank-1 on behalf of the SAMRDH 19 LLC ("SAMRDH 19"), one of the Grover Companies, I have learned the following:

   a. On or about June 8, 2020 and on or about February 24, 2021, GROVER signed and submitted the SAMRDH 19 loan applications for "first draw" and "second draw" PPP loans, respectively.

   b. GROVER represented that he was the 100 percent owner and "Managing Member" of SAMRDH 19, and that SAMRDH 19 was a corporation based in Seaford, New York, with five employees and an average monthly payroll of $34,372. But from my review of information from the SSA and NYDOL, I know that SAMRDH 19 did not report to the SSA or NYDOL that it had paid wages to any employees in 2019 or the first half of 2020.

   c. GROVER marked the "No" checkbox in response to the question: "Is the Applicant or any owner of the Applicant an owner of any other business, or have common management…with, any other business?" But from my review of additional PPP loan applications and business entity records filed with the New York Department of State

("NYDOS"), I know that GROVER is, and has represented himself as, the owner of dozens of other businesses.

## Misuse of the Grover Companies' Loan Proceeds

15. From my review of bank account records for the Grover Companies and the Client Companies, I know that the loan proceeds disbursed into these accounts were often comingled and used for impermissible purposes. For example, from my review of bank records for SAMRDH 19 and other Grover Companies, I have learned the following:

    a. On or about June 15, 2020, "first draw" PPP loan proceeds of $85,900 were disbursed into a SAMRDH 19 Bank-1 account. On or about March 2, 2021, "second draw" PPP loan proceeds of $85,900 were disbursed into the same account.[2]

    b. At least a portion of the PPP loans from these disbursements were transferred to bank accounts belonging to other Grover Companies, in the form of at least $50,000 in checks that purported to serve the purpose of extending or repaying loans, or which were used to pay back taxes for an entity other than SAMRDH 19.[3] Specifically:

        i. On or about February 10, 2021, $5,000 was withdrawn from SAMRDH 19's Bank-1 account in the form of a check made payable to WISE E SOLUTIONS, another of the Grover Companies.

        ii. On or about February 10, 2021, $5,000 was withdrawn from SAMRDH 19's Bank-1 account in the form of a check made payable to SAMRDH 21 LLC ("SAMRDH 21"), with a memo line stating "LOAN."

        iii. On or about February 16, 2021, $10,000 was withdrawn from SAMRDH 19's Bank-1 account in the form of a check made payable to SAMRDH 21, with a memo line stating "LOAN."

        iv. On or about February 19, 2021, $3,027 was withdrawn from SAMRDH 19's Bank-1 account in the form of a check made payable to SAMRDH 21, with a memo line stating "LOAN RETURN."

---

[2] A number of Grover Companies and Client Companies also obtained loans from the COVID-19 Economic Injury Disaster Loan (EIDL) program administered by the SBA. For example, on or about June 17, 2020 and June 29, 2020, EIDL funds totaling $23,400 were disbursed into the SAMRDH 19 Bank-1 account.

[3] At the time of the first disbursement, the balance of the SAMRDH 19 Bank-1 account was approximately $3,000, and between the first disbursement on or about June 15, 2020 and the closing of the account on or about May 21, 2021, additional funds totaling only approximately $37,650 were deposited into the account. Thus, the more than $50,000 withdrawn from the account for the above purposes necessarily included the PPP loans.

     v. On or about April 27, 2021, $2,000 was withdrawn from SAMRDH 19's Bank-1 account in the form of a check made payable to SAMRDH 12 LLC ("SAMRDH 12"), with a memo line stating "LOAN."

     vi. On or about May 3, 2021, $31,808 was withdrawn from SAMRDH 19's Bank-1 account in the form of a check made payable to the U.S. Treasury with a memo line containing a past month ("DEC 2019") and the name and EIN of EZZ Services, another company controlled by an associate of GROVER. On the same day, approximately $4,435 was withdrawn from SAMRDH 19's Bank-1 account in the form of a second check made payable to the U.S. Treasury with a memo line containing a past month ("SEPT 2019") and the same company information. Based on my training and experience, and my personal involvement in this investigation, I believe that these checks were used to pay back taxes owed by the company indicated in the memo lines.

     vii. On or about May 10, 2021, $4,000 was withdrawn from SAMRDH 19's Bank-1 account in the form of a check made payable to SAMRDH 12, with a memo line stating "LOAN."

  16. SANDEEP GROVER, the defendant, also used PPP loan proceeds obtained on behalf of the Grover Companies to purchase property. For example, from my review of a PPP application submitted to Bank-2 by ME IN GREEN LLC ("ME IN GREEN"), one of the Grover Companies, I have learned the following:

    a. On or about April 28, 2020, GROVER signed and submitted the application for a "first draw" PPP loan on behalf of ME IN GREEN.

    b. The loan application represented that GROVER was the 100 percent owner and president of ME IN GREEN, and that ME IN GREEN was a limited liability company based in Seaford, New York, with five employees and an average monthly payroll of $26,430. But from my review of information from the SSA and NYDOL, I know that ME IN GREEN did not report to the SSA or NYDOL that it had paid any employees wages in 2019 or the first half of 2020.

    c. On the "Funds Disbursement Request" form, GROVER indicated that the loan proceeds should be disbursed to a Bank-1 account with an account number ending in -8587.

  17. From my review of bank records maintained by Bank-1 and Bank-2, I have learned the following:

    a. The 8587 account was held not in the name of ME IN GREEN but in the name of RRW General Construction Inc. ("RRW"), a company owned by GROVER that did report to the SSA that it had paid employees wages in 2019 and 2020 and separately applied for and obtained PPP loans.

    b. On or about May 4, 2020, $66,075 in loan proceeds intended for ME IN GREEN was disbursed to the RRW Bank-1 account. At the time of the disbursement, the balance of the RRW account was less than $400.

8

    c. On or about May 8, 2020, before any additional funds were deposited into the RRW Bank-1 account, $60,000 from the RRW Bank-1 account, consisting mostly or entirely of the loan proceeds disbursed to ME IN GREEN, was deposited into the Bank-2 account of LETS GO TOGETHER LLC ("LETS GO TOGETHER"), a company controlled by GROVER. At the time of the deposit, the LETS GO TOGETHER account already contained $75,566.48, most of which had been deposited over the preceding four days, resulting in a total balance of $135,566.48.

   18. The same day, on or about May 8, 2020, the LETS GO TOGETHER account wired $124,000 of the $135,566.48, including most of the loan proceeds disbursed to ME IN GREEN, to a law firm based in Wilkes-Barre, Pennsylvania. The wire details indicate that the wire was for the "Purchase of Property."

## Identity Theft

   19. SANDEEP GROVER, the defendant, used information to which he had access as a tax preparer for the Client Companies to submit fraudulent PPP loan applications, sometimes using the PII of the owners of the Client Companies without their authorization to obtain loan proceeds for his own personal use.

   20. For example, from my review of a PPP loan application submitted to Bank-1 on behalf of BAYRIDGE WATERPROOFING INC. ("BAYRIDGE"), one of the Client Companies, I have learned the following:

    a. On or about June 15, 2020, the loan application was purportedly signed and submitted by an individual described as the 90 percent owner and president of BAYRIDGE. I have since learned the individual worked as GROVER's driver (the "Driver"), and that GROVER submitted the application without the Driver's authorization.

    b. The loan application certified that BAYRIDGE was a corporation based in Selden, New York, with five employees and an average monthly payroll of $32,808. But from my review of information from the SSA and NYDOL, I know that BAYRIDGE did not report to the SSA or NYDOL that it had paid any employees wages in 2019 or the first half of 2020.

   21. Based on my review of bank records maintained by Bank-1 and Bank-2, I have learned the following:

    a. Bank-1 approved the loan, and on or about June 23, 2020, disbursed $82,000 in loan proceeds to a BAYRIDGE account maintained at Bank-1.

    b. On or about June 30, 2020, the entire $82,000 in loan proceeds was withdrawn from the BAYRIDGE Bank-1 account and used to purchase a bank check made payable to BAYRIDGE. On or about September 3, 2020, the $82,000 check was deposited into a BAYRIDGE account maintained at Bank-2. At the time of the deposit, the Bank-2 account balance was $100.

    c. The signature card for the Bank-2 account lists only GROVER, the defendant, as the business owner and authorized signer.[4]

    d. The loan proceeds in the Bank-2 account were used to pay LETS GO TOGETHER and four other companies, through a series of check withdrawals and online transfers, as depicted below.[5] Two were Grover Companies that had previously applied for and obtained PPP loans of their own — EXCELLENT LIFE CORP. ("EXCELLENT LIFE") and SAMRIDH LLC ("SAMRIDH"). A third company, which received a payment from the loan proceeds in the Bank-2 account, was controlled by GROVER, SAMRDH 18 LLC ("SAMRDH 18") and a fourth company, SOWEN INC. ("SOWEN"), had been incorporated by GROVER on behalf of a client. The check payment to SOWEN contained the memo line, "Loan Repayment."

| Date | Payee | Amount |
| --- | --- | --- |
| 10/13/2020 | LETS GO TOGETHER LLC | $20,000 |
| 10/20/2020 | EXCELLENT LIFE CORP. | $20,000 |
| 10/21/2020 | SAMRDH 18 LLC | $10,000 |
| 10/21/2020 | SAMRIDH LLC | $5,000 |
| 12/09/2020 | SOWEN INC. | $18,000 |

  22. Based on my December 16, 2021 interview[6] of the Driver, I learned the following:

    a. The Driver worked for SANDEEP GROVER, the defendant, for approximately four to five years, until in or about May 2021. The Driver was aware that in or about 2018 or 2019, GROVER opened the company BAYRIDGE in the Driver's name, but the Driver had no involvement with the company and did not learn whether the company ever did any business or had any employees.

    b. In or about 2020, GROVER visited the Driver's home to ask if he wanted a loan from the government that the Driver would not have to pay back. The Driver indicated he did not need a loan and declined.

    c. In or about 2021, the Driver began receiving letters from Bank-1 regarding the repayment of an $82,000 loan.

---

[4] During a recorded telephone call between a customer service representative of Bank-1 and GROVER, which occurred in or about 2021, GROVER described himself as the President and 50 percent owner of BAYRIDGE, and the Driver as the other 50 percent owner and Vice President. GROVER indicated he had joined the business after it was established by the Driver.

[5] Aside from the $100 starting balance and PPP loan proceeds, only $5,100 in funds were deposited into the account during the three months it was open.

[6] Because the Driver advised that he was not a fluent English speaker, a relative of the Driver provided translation assistance.

    d. The Driver confirmed to me that he did not submit or authorize the submission of an application for a PPP loan in his name, nor did he receive any PPP loan money. When shown a copy of the PPP loan application that had been submitted on BAYRIDGE's behalf, the Driver indicated the signature and handwritten initials were not his, but he recognized the phone number as GROVER's and the email address as belonging to GROVER's son.

### Misuse of the Client Companies' Loan Proceeds

  23. Based on my February 15, 2022 interview with a business partner of SANDEEP GROVER, the defendant (the "Business Partner"), and my review of records relating to the formation of SAMRDH 36 LLC ("SAMRDH 36"), I have learned that GROVER used PPP loan proceeds, including some of the BAYRIDGE loan proceeds described above, to buy out the Business Partner's stake in SAMRDH 36, including the property purchased with the Business Partner's invested principal. The Business Partner stated, in substance and in part:

    a. In or about 2019, GROVER proposed that the Business Partner invest money from the Business Partner's 401(k) savings plan to start a joint business venture with GROVER involving property rentals. The Business Partner agreed, and in or about December 2019, the Business Partner and GROVER formed the limited liability company SAMRDH 36. In connection with the business, the Business Partner authorized a $697,000 loan from his 401(k) to EXCELLENT LIFE, one of the Grover Companies, and a portion of the funds were used to purchase a house in Shirley, New York, for approximately $325,000.

    b. The Business Partner was provided some portion of profits from the rental of the Shirley house. After approximately one year, GROVER agreed to buy out the Business Partner's half of the business (the "Business Buyout").

  24. Based on my review of checks paid by GROVER to the Business Partner's $401(k) account, I have learned that, in connection with the Business Buyout, GROVER repaid the Business Partner his full principal of $697,000 in just over three months, through 12 payments made between in or about September 2020 and in or about January 2021, as detailed below:

| Date: | Payor: | Amount: |
|---|---|---|
| 09/30/2020 | EXCELLENT LIFE CORP. | $200,000 |
| 10/15/2020 | EXCELLENT LIFE CORP. | $100,000 |
| 10/21/2020 | EXCELLENT LIFE CORP. | $100,000 |
| 11/04/2020 | EXCELLENT LIFE CORP. | $50,000 |
| 11/25/2020 | SANDEEP GROVER | $14,000 |
| 11/25/2020 | EXCELLENT LIFE CORP. | $51,000 |
| 01/08/2021 | SANDEEP GROVER | $35,000 |
| 01/08/2021 | SAMRDH 39 LLC | $35,000 |
| 01/08/2021 | SAMRDH 11 LLC | $50,000 |
| 01/08/2021 | SANDEEP GROVER | $35,000 |
| 01/08/2021 | SAMRIDH 33 LLC | $27,000 |

  25. Based on my review of the bank accounts from which SANDEEP GROVER, the defendant, paid the Business Partner, I believe that GROVER used PPP loan proceeds to fund at

a substantial portion of the Business Buyout. For example, of the $697,000 total principal, GROVER made four payments totaling $501,000 to the Business Partner through an EXCELLENT LIFE Bank-2 account. Just before EXCELLENT LIFE made each of these payments to the Business Partner, GROVER transferred PPP loan proceeds from the accounts of various Grover Companies and Client Companies to the EXCELLENT LIFE account. For example:

      a.    On or about October 13, 2020, two days before EXCELLENT LIFE's first $100,000 payment to the Business Partner, the EXCELLENT LIFE account had a balance of only $1,804.11. But over the next two days, four checks totaling $105,000 were deposited into the EXCELLENT LIFE account[7]:

| Date | Payor | Amount |
|---|---|---|
| 10/13/2020 | KPSVRZA LLC | $35,000 |
| 10/13/2020 | 11040 207 STREET LLC | $20,000 |
| 10/14/2020 | LETS GO TOGETHER LLC | $25,000 |
| 10/14/2020 | CANOE 1 LLC | $25,000 |

      b.    Based on my review of PPP loan applications and related bank records, I have learned that, prior to these transfers to EXCELLENT LIFE, PPP funds were transferred from BAYRIDGE to LETS GO TOGETHER, and PPP funds were disbursed to the Grover Companies KPSVRZA LLC ("KPSVRZA") and 11040 207 STREET LLC ("207 STREET").[8] At least one of these three transfers to EXCELLENT LIFE, and potentially all of them,[9] contained PPP loan proceeds. Specifically:

           i.    As already detailed above, on or about June 23, 2020, a PPP loan of $82,000 was disbursed into BAYRIDGE's Bank-1 account and then transferred into BAYRIDGE's Bank-2 account. At the time of the transfer of PPP loan proceeds into the Bank-2 account, the Bank-2 account balance was approximately $100.

           ii.    On or about October 13, 2020, before any additional funds were deposited into the BAYRIDGE Bank-2 account, $20,000 was transferred by check with the memo line "Rent" from BAYRIDGE to a LETS GO TOGETHER account. At the time of the transfer, the balance of the LETS GO TOGETHER account was approximately $6,726.

---

[7] Each of the four checks had a memo line stating "RETURN OF INVESTMENT" or some variation thereof.

[8] On or about June 2020, EIDL funds of $32,900 were also deposited into the account belonging to Canoe 1, a company owned by GROVER.

[9] Based on my review of PPP loan applications and bank records, I am aware that in or about August 2020, KPSVRZA and 11040 207 STREET obtained PPP loans of $83,492 and $85,267, respectively. But because additional funds were subsequently deposited into all both companies' accounts, I have not yet been able to determine whether their payments to EXCELLENT LIFE for the Business Buyout contained the PPP loan proceeds.

     iii. The next day, on or about October 14, 2020, before any additional funds were deposited into the LETS GO TOGETHER account, $25,000 was transferred by check from the LETS GO TOGETHER account and another $25,000 was transferred by check from a CANOE 1 account to the EXCELLENT LIFE account. At the time of the transfers, the balance of the EXCELLENT LIFE account was approximately $56,801.

     iv. The next day, on or about October 15, 2020, before any additional funds were deposited into the EXCELLENT LIFE account, $100,000 was transferred by check from EXCELLENT LIFE to the Business Partner.

     v. Based on the foregoing, I believe that EXCELLENT LIFE's October 15, 2020 payment of $100,000 to the Business Partner contained BAYRIDGE PPP loan proceeds.

   c. GROVER repeated this pattern to complete the Business Buyout. On or about October 20, 2020, one day before EXCELLENT LIFE'S second $100,000 payment to the Business Partner, the EXCELLENT LIFE bank account had a balance of only $6,801. But over the next two days, the following check deposits, totaling $80,000, were made into the EXCELLENT LIFE account:

| Date | Payor | Amount |
|---|---|---|
| 10/20/2020 | KPSVRZA LLC | $20,000 |
| 10/20/2020 | BAYRIDGE | $20,000 |
| 10/20/2020 | 132 55 159th STREET | $20,000 |
| 10/20/2020 | CANOE 1 LLC | $20,000 |

   d. Based on my review of PPP loan applications and related bank records, I have learned that at least two of these transfers[10] contained PPP loan proceeds. Specifically:

     i. Based on my review of the BAYRIDGE account, I know that no additional funds were deposited into the BAYRIDGE account containing mostly PPP loan proceeds between its October 13, 2020 payment to EXCELLENT LIFE and its October 20, 2020 payment to EXCELLENT LIFE. Based on the foregoing, I believe that the October 20, 2020 payment of $20,000 to EXCELLENT LIFE also contained BAYRIDGE PPP loan proceeds.

     ii. In addition, based on my review of a PPP loan application submitted to Bank-3 by 132-55 159th STREET LLC ("159th STREET"), one of the Client Companies, and 159th STREET's Bank-2 account records, I have learned that 159th STREET received a PPP loan of $80,550 on or about June 1, 2020.[11] At the time of the first disbursement, the account balance was only $518.65, and less than $14,000 in additional funds was deposited

---

[10] I have not been able to determine whether the checks written from the accounts of KPSVRZA and Canoe 1 contained PPP or EIDL loan proceeds, respectively, for the reasons stated above.

[11] On or about June 26, 2020, an EIDL loan of $39,500 was also deposited into 159th STREET's Bank-2 account.

13

into the account between either loan disbursement and the October 20, 2020 payment of $20,000 to EXCELLENT LIFE listed above.

        iii.    Based on the foregoing, I believe that EXCELLENT LIFE'S October 21, 2020 payment of $100,000 to the Business Partner contained 159th STREET PPP loan proceeds.

26.    Of the $697,000 total principal, SANDEEP GROVER, the defendant, also paid the Business Partner $50,000 through SAMRDH 11 LLC ("SAMRDH 11"), one of the Grover Companies. Based on my review of a PPP loan application submitted to Bank-2 by SAMRDH 11 and related bank records, I have learned the following:

    a.    The loan application represented that GROVER's wife was the 100 percent owner and managing member, and that SAMRDH 11 was a limited liability company based in Seaford, New York, with five employees and an average monthly payroll of $32,415. But based on my review of information from the SSA and NYDOL, I know that SAMRDH 11 did not report to the SSA or NYDOL that it had paid any employees wages in 2019 or the first half of 2020.

    b.    Bank-2 approved the PPP loan and, on or about August 6, 2020, disbursed $81,037 to SAMRDH 11's Bank-2 account.

    c.    At the time of the loan disbursement, the balance of the SAMRDH 11 account was approximately $9,786, and between the disbursement and the January 8, 2021 payment to the Business Partner, only $5,590 in additional funds was deposited into the account.

    d.    On or about December 4, 2020, $74,425.89 was withdrawn from the Bank-2 account, emptying it, and on or about January 8, 2021, a bank check for $50,0000 with the remitter listed as SAMRDH 11 was paid to the Business Partner. Based on the foregoing, I believe that SAMRDH 11's January 8, 2021 payment to the Business Partner contained SAMRDH 11 PPP loan proceeds.

**GROVER and SEHGAL's Participation in a Conspiracy Involving Client Companies**

27.    SANDEEP GROVER, the defendant, also enlisted the putative owners of several Client Companies to assist GROVER in submitting fraudulent PPP loan applications and misusing the proceeds.

28.    For example, from in or about April 2020 to in or about April 2021, SHIKHA SEHGAL, the defendant, submitted PPP loan applications on behalf of at least four Client Companies under her ownership: GIFTSFARM INC. ("GIFTSFARM"), SILENT VALLEY USA LLC ("SILENT VALLEY"), TEHZEEB ENTERPRISES INC. ("TEHZEEB"), and THEORY OF ARTS AND SCIENCES ("THEORY"). I believe that SEHGAL actively worked with GROVER to make these submissions, based on the following:

    a.    Each application listed SEHGAL as the 100 percent owner of the corporate applicant, which was one of the Client Companies; contained SEHGAL's personal phone number (the "Sehgal Phone") and/or home address; and was submitted with IRS Form

940s and 941s that were prepared by EBS and which were, in substance, similar to IRS forms submitted with many other of the Grover Companies' and Client Companies' PPP loan applications.

        b.        Bank-3 maintained correspondence from an email address associated with SEHGAL and transcripts and audio recordings of calls made by SEHGAL using the SEHGAL Phone, which show that SEHGAL repeatedly contacted Bank-3 to check on the status of certain PPP loan applications, including those submitted on behalf of THEORY and GIFTSFARM.

        29.        Three of the companies owned by SHIKHA SEHGAL, the defendant, submitted only second draw PPP loan applications to Bank-1. Bank-1 approved the PPP loans, and on or about February 5, 2021 disbursed approximately $84,500 to GIFTSFARM, on or about March 23, 2021 disbursed approximately $92,000 to SILENT VALLEY, and on or about April 27, 2021 disbursed approximately $93,700 to TEHZEEB. I believe that the loan applications contain false representations, based on the following:

        a.        All three applications certified that SEHGAL was not the owner of any other businesses. But based on my review of PPP loan applications and business entity records filed with NYDOS, I know that SEHGAL is, and has represented herself as, the owner of multiple businesses.

        b.        All three applications certified that each company had five or six employees and an average monthly payroll of between $33,000 and $38,000 in both 2019 and 2020. But based on my review of information from the SSA and NYDOL, I know that GIFTSFARM, SILENT VALLEY, and TEHZEEB did not report to the SSA or NYDOL that they had paid any employees wages in 2019 or 2020.

        c.        Based on my review of the supporting documentation submitted with TEHZEEB's loan application, I know that TEHZEEB submitted a fake bank statement falsely representing that TEHZEEH held an account at Bank-4. Based on my correspondence with an employee at Bank-4, I have learned that TEHZEEB does not have and has never had such an account at Bank-4.

        30.        A fourth corporate entity owned by SHIKHA SEHGAL, the defendant, THEORY, which was one of the Client Companies, first attempted to fraudulently obtain a small PPP loan from Bank-3, before deliberately canceling the application and fraudulently obtaining two much larger PPP loans from Bank-1. Specifically:

        a.        On or about April 13, 2020, THEORY submitted a PPP loan application to Bank-3 indicating an average monthly payroll of approximately $4,423 and thus its eligibility for a loan of approximately $11,059. For purposes of setting up direct deposit, the application included the account number and routing number details for THEORY's Bank-4 account.[12] As part of the bank account verification process, on or about April 15, 2020, the Bank-3's PPP loan

---

[12] Opening documents show that SEHGAL is a signatory on the THEORY Bank-4 account.

servicer made two microdeposits into THEORY's Bank-4 account.[13] During a subsequent phone call made by SEHGAL in or about June 2020, which was recorded by the loan servicer, SEHGAL sought to obtain the cancellation number of the prior PPP loan application. SEHGAL told the loan servicer representative that she sought to obtain the cancellation number at the direction of her accountant. As such, it appears, SEHGAL submitted a smaller, possibly legitimate PPP loan application, but cancelled the application in order to obtain a larger, fraudulent loan through her accountant, GROVER.

    b.  On or about June 30, 2020 and on or about July 24, 2020, SEHGAL submitted two PPP loan applications to Bank-3, but these applications reported much larger, and slightly different, average monthly payrolls for THEORY, in the amounts of $30,437 (in connection with a $76,092 loan request) and $30,800 (in connection with a $76,999 loan request).

    31.  THEORY also applied (i) for a loan from the EIDL program and (ii) both first draw and second draw PPP loan applications from Bank-1. The SBA approved the EIDL loan, and on or about April 28, 2020, disbursed $10,000 to THEORY's Bank-4 account. Bank-1 also approved the PPP loans, and on or about August 10, 2020 and February 17, 2021, disbursed two payments of $76,900 each to THEORY's Bank-1 account. I believe SHIKHA SEHGAL, the defendant, conspired with SANDEEP GROVER, the defendant, to submit false representations as part of the PPP loan applications, based on the following:

    a.  Both PPP loan applications certified that THEORY had six employees and an average monthly payroll of approximately $30,799, in 2019 and 2020, respectively, and were submitted with IRS forms that indicated THEORY paid annual total wages of $369,596. These representations are inconsistent with (i) the EIDL loan application, which certified that THEORY had 29 employees, (ii) information from the SSA, which shows that THEORY reported to the SSA that it had paid only approximately $52,000 in wages to employees in all of 2019, and (iii) the unsuccessful PPP loan application that THEORY submitted in or about April 2020 to Bank-3, which certified that THEORY had 11 employees and an average monthly payroll of approximately $4,423 in 2019 and the first half of 2020.

    b.  As noted above, on both PPP applications, SEHGAL certified that she was the 100 percent owner of THEORY. These representations are inconsistent with (i) the EIDL loan application, which certified that ownership of the company was divided between SEHGAL, who purportedly owned 67 percent, and a second individual ("Individual-1"), who purportedly owned 33 percent, and (ii) a 2016 operating agreement signed by THEORY corroborating SEHGAL's partial ownership.[14]

---

[13] Bank-4 is headquartered in Manhattan and, from my correspondence with a representative at Bank-4, I have learned that Bank-4 processes all transactions through a server located in Manhattan.

[14] On or about December 2, 2022, I also conducted an interview of Individual-1's spouse, who confirmed that, in or about September 2016, Individual-1's spouse had purchased a 33 percent stake in THEORY for $37,500, in the name of Individual-1, and that in or about 2020,

    c. Both PPP applications certified that SEHGAL was not the owner of any other businesses. But as detailed above, based on my review of additional PPP loan applications and business entity records filed with NYDOS, I know that SEHGAL is, and has represented herself as, the owner of other businesses.

  32. Similarly, based on my review of PPP loan applications submitted to Bank-1 and my November 19, 2022 interview with the applicant who submitted those applications ("CC-1"), I have learned that CC-1 made deliberate misrepresentations and submitted fake documents to Bank-1, and that he did so on the express instructions of SANDEEP GROVER, the defendant. Specifically:

    a. In or about mid-2020, CC-1, at the time an EBS client, sought and obtained GROVER's assistance in obtaining a PPP loan for the only one of CC-1's companies that did any business.

    b. In or about late 2020, GROVER asked CC-1 if CC-1 had any other businesses. CC-1 indicated that he had dormant companies that did no business and had no bank accounts, SMART DEALZ LLC ("SMART DEALZ") and "IMPEX INTERNATIONAL LLC ("IMPEX").

    c. On GROVER's instructions, CC-1 opened bank accounts at Bank-1 for SMART DEALZ and IMPEX, sent the account information to GROVER, and fabricated invoices for both companies to make it appear as if the companies were doing business.

    d. In or about late 2020 or early 2021, GROVER indicated that CC-1 owed GROVER 15 percent of the loan for GROVER's services.

    e. CC-1 spoke to GROVER by phone on multiple occasions to discuss the PPP loans and prepared the fake PPP loan documentation from the residence of CC-1 in Putnam County, New York.

---

SEHGAL had paid Individual-1 and Individual-1's spouse a little more than $105,000 to buy back the 33 percent stake and repay Individual-1's spouse for certain loans. Based on my review of bank records, I believe that SEHGAL bought back the ownership interest using PPP and EIDL funds provided by SAMRIDH 1 LLC ("SAMRIDH 1"), one of the Grover Companies, and that the ownership interest was then transferred to GROVER's wife. Specifically, in or about May and June 2020, $42,850 in PPP funds and $100,600 in EIDL funds were disbursed to SAMRIDH 1's Bank-5 account. On or about July 13, 2020, a check for $105,000 from SAMRIDH 1's Bank-5 account was, in turn, deposited into THEORY's Bank-4 account. On or about July 15, 2020, two checks totaling a little more than $105,000 were paid from THEORY's Bank-4 account to Individal-1, with the memo line "TAS Sale of Shares-33%," and to Individual-1's spouse, with the memo line "Loan Repayment." Finally, on or about August 10, 2020, GROVER's wife signed a corporate resolution and account agreement confirming her joint ownership of THEORY with SEHGAL and her addition as an authorized user on the Bank-4 account.

33. Based on my review of PPP loan applications submitted to Bank-1 on behalf of SMART DEALZ and IMPEX, I have learned the following:

 a. On or about March 15, 2021 and on or about April 23, 2021, PPP loan applications for SMART DEALZ and IMPEX were submitted by their purported owners, who CC-1 subsequently identified as CC-1's father and mother, respectively.

 b. The loan applications represented that in 2020, SMART DEALZ had five employees and an average monthly payroll of $32,286, and that IMPEX had six employees and an average monthly payroll of $33,660. But from CC-1, I have learned that neither company had any employees or payroll in 2020 and, based on my review of information from the SSA and NYDOL, I also know that neither company reported to the SSA or NYDOL that it had paid any employees in 2020.

 c. The loan applications included IRS Form 940s and 941s prepared by EBS, the appearance of which is consistent with that of the IRS Form 940s and 941s submitted with the PPP loan applications of the Grover Companies and the remaining Client Companies.

 d. Bank-1 approved the PPP loans, and on or about March 23, 2021, $80,700 was disbursed into SMART DEALZ Bank-1 bank account, and on or about April 29, 2021, $84,100 was disbursed into the IMPEX Bank-1 bank account.

34. WHEREFORE, deponent respectfully requests that warrants be issued for the arrest of SANDEEP GROVER and SHIKHA SEHGAL, the defendants, and that they be arrested, and imprisoned or bailed, as the case may be.

/s/ sworn telephonically
_____
Special Agent Kenneth Hosey
Federal Bureau of Investigation

Sworn to before me by reliable
electronic means pursuant to
Fed. R. Cr. P. 41(d)(3) and 4.1 this
__22__ day of May, 2023

*Gabriel W. Gorenstein*
_____
THE HONORABLE GABRIEL W. GORENSTEIN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK