

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Building*
*26 Federal Plaza*
*New York, New York 10278*

August 18, 2025

The Honorable Analisa Torres
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl St.
New York, NY 10007-1312

      Re:    *United States v. Sandeep Grover*, 24 Cr. 46 (AT)

Dear Judge Torres:

      The Government respectfully submits this letter in advance of the August 25, 2025 sentencing of defendant Sandeep Grover. For the reasons detailed below, a sentence of imprisonment within the applicable U.S. Sentencing Guidelines ("U.S.S.G." or "Guidelines") range of 121 to 151 months' imprisonment would be a fair and appropriate sentence for this defendant and is necessary to reflect the seriousness of the offense, to afford adequate deterrence to criminal conduct, and to protect the public from further crimes by the defendant.

**I.  Background**

    **A.  The Offense Conduct**

        **1.  Overview**

      Sandeep Grover is the owner of Excellent Business Services Inc. ("EBS"), an accounting and tax preparation business based in Seaford, New York. *See* Final Presentence Investigation Report ("PSR") ¶ 14. From about April 2020 through at least June 2021, Grover worked with others to perpetrate a fraud scheme that involved using EBS to prepare and submit hundreds of fraudulent applications to various banks to obtain millions of dollars set aside by the Small Business Administration ("SBA") to assist small businesses struggling during the COVID-19 pandemic. *Id.* ¶ 2. Called the Payment Protection Program ("PPP"), this federal program provided eligible small businesses with forgivable loans, based on a business's average monthly payroll costs, to keep businesses afloat and people employed notwithstanding the economic challenges created by the pandemic. As part of the program, businesses seeking PPP funds applied for loans from banks that were responsible for reviewing and verifying the information; once the applications were approved by the SBA, the loans were disbursed to the businesses. The PPP loans were guaranteed by the SBA, thereby minimizing the risk to the participating banks.

      With the help of co-conspirators, Grover submitted hundreds of fraudulent applications on behalf of more than 100 companies either owned by EBS clients or owned in whole or in part by

Grover. *Id.* ¶¶ 14-15. For many companies, Grover submitted, or caused to be submitted, not one but two rounds of applications and thereby procured multiple loans. Most of these companies did not do legitimate business and did not report any wages to the Social Security Administration ("SSA") or the New York Department of Labor ("NYDOL"). In total, Grover fraudulently obtained at least $11,881,151.50 in PPP loans. *Id.* ¶ 15(a).

As part of the loan applications, Grover specifically included and certified false information about the companies' number of employees and payroll, and supported these statements with elaborate supporting documentation, such as doctored bank statements. *Id.* ¶ 15(b). Notably, Grover misused his skills as an accountant and his tax preparation business to prepare the tax forms that were submitted with the PPP loan applications, methodically submitting fake IRS Form 940s (Employer's Annual Federal Unemployment (FUTA) Tax Returns) and IRS Form 941s (Employer's Quarterly Federal Tax Returns) for which EBS was the listed preparer. *Id.*

### 2. Grover's Companies

Many of the fraudulent applications were submitted on behalf of companies owned in whole or in part by Grover or his wife. *Id.* ¶ 15(a). Most of these companies, in turn, were shell companies: a substantial number had similar names, appeared to do no legitimate business, and obtained tens of thousands of dollars in PPP loans.

For example, below is a small sample of the subset of Grover-owned businesses with names that derive from "SAMRIDH LLC":

| Borrower | Loan Disbursements |
|---|---|
| SAMRIDH LLC | $122,700 |
| SAMRIDH 1 LLC | $42,850, $42,850 |
| SAMRIDH 3 LLC | $48,480 |
| SAMRIDH 5 LLC | $79,262 |
| SAMRDH 7 LLC | $78,875 |
| SAMRIDH 9 LLC | $88,951, $88,949 |
| SAMRDH 11 LLC | $81,037 |
| SAMRDH 12 LLC | $95,700 |
| SAMRDH 19 LLC | $85,900, $85,900 |
| SAMRDH 21 LLC | $72,800, $72,800 |
| SAMRIDH 33 LLC | $102,617 |
| SAMRIDH 35 LLC | $103,072 |

*Id.* ¶ 25. The loan applications that Grover submitted for these companies were replete with false representations. For instance, or about June 8, 2020 and on or about February 24, 2021, Grover signed and submitted the SAMRDH 19 loan applications for "first draw" and "second draw" PPP loans, respectively. *Id.* ¶ 28. Grover represented that he was the 100 percent owner and "Managing Member" of SAMRDH 19, and that SAMRDH 19 was a corporation based in Seaford, New York, with five employees and an average monthly payroll of $34,372. *Id.* But information from the SSA and NYDOL confirmed that SAMRDH 19 did not report to the SSA or NYDOL that it had paid wages to any employees in 2019 or the first half of 2020. *Id.*

Grover marked the "No" checkbox in response to the question: "Is the Applicant or any owner of the Applicant an owner of any other business, or have common management…with, any other business?" *Id.* But additional PPP loan applications and business entity records filed with the New York Department of State demonstrated that Grover is, and has represented himself as, the owner of dozens of other businesses. *Id.*

3. **Misuse of Loans**

Grover then went on to misuse the proceeds he obtained for numerous impermissible purposes. For example, on or about June 15, 2020, first-round PPP loan proceeds of $85,900 were disbursed into a SAMRDH 19 bank account. *Id.* ¶ 29. On or about March 2, 2021, "second draw" PPP loan proceeds of $85,900 were disbursed into the same account. *Id.* At least a portion of the PPP loans from these disbursements were almost immediately transferred to bank accounts belonging to other Grover-owned companies, in the form of at least $50,000 in checks that purported to serve the purpose of extending or repaying loans, or which were used to pay back taxes for an entity other than SAMRDH 19. *Id.*

Grover also repeatedly misused PPP funds to purchase property, and relied on false certifications and a labyrinth of business bank accounts to achieve this end. *Id.* ¶ 30. For instance, on or about April 28, 2020, Grover signed and submitted the application for a first-round PPP loan on behalf of a company called Me In Green. *Id.* The loan application represented that Grover was the 100 percent owner and president of Me In Green, and that Me In Green was a limited liability company based in Seaford, New York, with five employees and an average monthly payroll of $26,430. *Id.* But information from the SSA and NYDOL revealed that Me In Green did not report to the SSA or NYDOL that it had paid any employees wages in 2019 or the first half of 2020. *Id.*

On the "Funds Disbursement Request" form, Grover indicated that the loan proceeds should be disbursed to a particular bank account with an account number ending in -8587. *Id.* However, the -8587 account was held not in the name of Me In Green but in the name of RRW General Construction Inc., another company owned by Grover that did report to the SSA that it had paid employees wages in 2019 and 2020 and yet separately applied for and obtained PPP loans. *Id/*

On May 4, 2020, $66,075 in loan proceeds intended for Me In Green was disbursed to the RRW bank account. At the time of the disbursement, the balance of the RRW account was less than $400. *Id.* ¶ 31. On May 8, 2020, before any additional funds were deposited into the RRW bank account, $60,000 from the RRW bank account, consisting mostly or entirely of the loan proceeds disbursed to Me In Green, was deposited into the bank account of Lets Go Together LLC, a company controlled by Grover. At the time of the deposit, the Lets Go Together account already contained $75,566.48, most of which had been deposited over the preceding four days, resulting in a total balance of $135,566.48. *Id.*

The same day, on or about May 8, 2020, the Lets Go Together account wired $124,000 of the $135,566.48, including most of the loan proceeds disbursed to Me In Green, to a law firm

based in Wilkes-Barre, Pennsylvania. The wire details indicate that the wire was for the "Purchase of Property." *Id.*

On another occasion, Grover impermissibly used PPP loan proceeds to buy out a business partner's ("Business Partner") stake in SAMRDH 36, including the property purchased with the Business Partner's invested principal. *Id.* ¶ 35. Specifically, in or about 2019, Grover proposed that the Business Partner invest money from the Business Partner's 401(k) savings plan to start a joint business venture with Grover involving property rentals. *Id.* The Business Partner agreed, and in or about December 2019, the Business Partner and Grover formed a limited liability company named SAMRDH 36 LLC. *Id.* In connection with the business, the Business Partner authorized a $697,000 loan from his 401(k) to Excellent Life, a Grover-owned company, and a portion of the funds were used to purchase a house in Shirley, New York, for approximately $325,000. *Id.*

The Business Partner was provided some portion of profits from the rental of the Shirley house. After approximately one year, Grover agreed to buy out the Business Partner's half of the business. *Id.* ¶ 36. Checks paid by Grover to the Business Partner's $401(k) account show that Grover repaid the Business Partner his full principal of $697,000 in just over three months, through 12 payments made between in or about September 2020 and in or about January 2021. *Id.* These repayments were made in substantial part using PPP loan proceeds. *Id.*

### 4. Client Companies and Grover's Work with Co-Conspirators

Grover did not merely submit applications on behalf of his own companies. He also enlisted the owners of various companies—including putative companies that did not conduct legitimate business—for his scheme. For example, he worked with co-defendant Shikha Sehgal to ensure she submitted PPP loan applications on behalf of at least four companies under her ownership: Giftsfarm Inc., Silent Valley USA LLC, Tehzeeb Enterprises Inc., and Theory of Arts and Sciences. Indeed, for one of these companies, Sehgal submitted an initial application reflecting relatively low employee and payroll figures; as part of Grover's scheme, however, she withdrew the application and submitted a new one containing higher, substantially revised figures.

Similarly, Grover's co-defendant and employee Abhijeet Singh also personally submitted, or was involved in submitting, at least five fraudulent applications; in accordance with the pattern of the larger scheme; his applications were submitted on behalf of companies that did not report any wages to the SSA or NYDOL and which relied on fake tax documents prepared by EBS. Singh's personal phone number appeared on all five applications, and his address was on four of the applications. Singh was also the sole or partial owner of three of the purported companies.

Still other co-conspirators included EBS clients on whose behalf Grover provided services. For example, one uncharged co-conspirator located in Putnam County, New York prepared his own fake PPP loan documentation and falsified payroll figures and other evidence of legitimate business on Grover's instructions.

Grover's sprawling fraud was logistically complex and required elaborate documentation. To coordinate his efforts and fabricate documents, he relied on co-defendants Singh and Sehgal to

do more than simply submit a handful of applications. For example, Singh oversaw the creation of what Singh knew to be fake loan application supporting documentation. On dozens of occasions, Singh instructed co-defendant Sehgal on which fake bank statements to "make." Evidence of his active participation included text messages from Singh to Sehgal, such as the following:



Sehgal, in turn, not only created dozens of fake bank statements for Grover but also called different banks to repeatedly check on the status of various fraudulent PPP loan applications.

### B. The Proceedings

On March 22, 2023, Grover and co-defendant Sehgal were charged by complaint, and on May 22, 2023, they were arrested.

On January 25, 2024, a grand jury indicted Grover and his co-defendants Singh and Sehgal with one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349. Grover was also charged with one count of major fraud against the United States, in violation of 18 U.S.C. § 1030, and one count of aggravated identity theft, in violation of 18 U.S.C. § 2261A.

On March 17, 2025, Grover pled guilty to major fraud against the United States and conspiracy to commit wire fraud, pursuant to a plea agreement. PSR ¶ 63.

### C. The Plea Agreement and Applicable Guidelines

In the plea agreement, the parties stipulated that Grover's crimes group under the Guidelines, and that the base offense level is 7, under USSG §2B1.1(a)(1). *Id.* ¶ 66. Because of the nature of Grover's role in the scheme, the parties further stipulated to four enhancements. First, a 20-level enhancement was warranted under USSG §2B1.1(b)(1)(K) because the defendant is responsible for an intended loss of $11,881,151.50; second, a 2-level increase was warranted under USSG §2B1.1(b)(17)(A) because the defendant individually derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense; third, a 4-level increase was warranted under USSG §3B1.1(a) because the defendant was an organizer, leader, manager, or supervisor in any criminal activity; and fourth, a 2-level increase is warranted under USSG §3B1.3 because, as a tax preparer, the defendant used a special skill in a manner that significantly facilitated the commission or concealment of the instant offense. *Id.* ¶¶ 67-71.

Because the defendant accepted responsibility and timely notified authorities of his intention to enter a plea of guilty, the offense level was decreased by three levels under USSG §3E1.1(a) and (b). *Id.* ¶ 75. Grover's total offense level is thus 32. *Id.* ¶ 77.

Grover has one criminal history point after he was pulled over for driving with a blood-alcohol concentration of 0.12 percent (according to a preliminary breath test) and convicted for driving while intoxicated. *Id.* ¶ 79. He was sentenced in December 2017 to a two-year term of probation, a $500 fine, and a six-month suspension of his driver's license; he was discharged from probation December 12, 2019. *Id.* His criminal history category is therefore I. *Id.* ¶ 80.

Based on a total offense level of 32, a criminal history category of I, his stipulated Guidelines range is 121-151 months. *Id.* ¶ 125. The fine range for the offenses is $35,000 to $1,000,000. In his plea agreement, Grover also agreed to pay $11,881,151.50 in forfeiture to the United States, and $3,748,458.80 in restitution to the victim, the SBA. *Id.* at 54.

### D. Probation's Recommendation

The U.S. Probation Office ("Probation") concurred with the parties' calculation of the Guidelines. Probation recommended a sentence of 84 months and, given Grover's ability to pay, a fine of $35,000. *Id.* at 52, 54.

## II. Discussion

### A. Applicable Law

The Guidelines are no longer mandatory, but they still provide important guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). The Guidelines range is thus "the lodestar" that "'anchor[s]'" the district court's discretion. *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1345-46 (2016) (quoting *Peugh v. United States*, 133 S. Ct. 2072, 2087 (2013)).

After making the initial Guidelines calculation, a sentencing judge must consider the factors outlined in Title 18, United States Code, Section 3553(a), and "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing: "a) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for that offense; b) the need to afford adequate deterrence to criminal conduct; c) the need to protect the public from further crimes by the defendant; and d) the need for rehabilitation." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (citing 18 U.S.C. § 3553(a)(2)).

### B. A Guidelines Sentence Is Appropriate.

Grover was the mastermind of an elaborate $12 million fraud that exploited and undermined a federal program designed to provide a temporary economic lifeline to small businesses during a devastating global disaster. Grover's egregious exploitation and defrauding of that program calls out for a sentence within the stipulated Guidelines range of 121-151 months.

For the reasons set forth below, such a sentence would be sufficient under the Section 3553(a) factors, and no greater than necessary to fulfill the objectives of sentencing in this case. Given Grover's substantial assets, the Government also agrees with Probation that a substantial fine should be imposed.

First, the nature and circumstances of the scheme and Grover's role in it support a Guidelines sentence. Grover was the undisputed leader of the charged fraud scheme and far more culpable than his co-defendants. Grover's offense conduct is particularly notable for its length and scale, for his leadership role, and for the enormous sums he personally pocketed, all against the backdrop of the COVID-19 disaster. Grover used his tax preparation business and his professional skills as an accountant to defraud the SBA of millions of dollars of U.S. taxpayer funds that Congress had set aside to assist Americans struggling through an unprecedented pandemic. This was a deliberate, carefully constructed crime, conducted by an individual intent on turning a global tragedy into an opportunity for personal grift.

The evidence shows the great lengths to which Grover was willing to go to reap these millions. Grover orchestrated an elaborate scheme that required the falsification of bank statements, tax documents, and payroll figures; the creation of shell companies and opening of shell company bank accounts; and the recruitment and coordination of conspirators, including an employee and multiple clients. He also obscured the sources of the money through constant transfers, withdrawals and deposits, and within days of receiving a tranche of PPP loans in the fall and winter of 2020—about $500,000—Grover used the funds to buy himself property.

Second, the defendant's history and personal characteristics also militate in favor of a substantial sentence. The Government recognizes that this is Grover's first felony conviction. But the conduct that brings him before the Court cannot be described as a lapse in judgment or one-off mistake. As Probation observed, "Due to the time span of the offense, Grover's criminal activities cannot be described as an isolated aberrant act." PSR at 53. Specifically, for more than a year, he iterated on and expanded his scheme. He submitted fraudulent applications when the first round of PPP loans were issued in 2020, and proceeded to again submit fraudulent applications in 2021. Not content to submit dozens of applications on his own, he recruited others—individuals who had no criminal histories—to falsify company records, doctor bank statements, make calls to banks, and submit additional applications.

Though the defendant has not yet filed a sentencing submission, the Government anticipates that he will argue for leniency based on certain personal factors such as his reputation within the Long Island community where he works and resides, and his advanced age. But neither factor is mitigating. In particular, the influence or prominence Grover apparently enjoys within his community only serves to underscore the fact that this was not a crime motivated by financial desperation. To the contrary, Probation emphasizes Grover's "substantial legitimate income from his employment and the profits generated by his businesses"—he enjoys an adjusted gross annual income of $358,985—and the fact that Grove "mastermind[ed] and committed his illicit conduct while not under any financial constraints." *Id.* at 45, 53. Indeed, Grover participated in this massive fraud despite enjoying the privileges of a professional degree, multiple thriving businesses, and family and community support. PSR ¶ 39. His own stable circumstances are particularly striking

to consider given he chose to defraud a program devoted to mitigating the widespread economic suffering and tumult created by the pandemic.

As to his age, Grover is only 56 years old. That is far from elderly. However, it is "old enough to know better" when it comes to violating federal laws and a reminder that, though "often people age out of criminal conduct, that ha[s] not happened here." *United States v. Mota*, No. 17-CR-123 (LAP), 2021 WL 2418330, at *3 (S.D.N.Y. June 14, 2021).

Grover may also emphasize that he has made significant repayments to the SBA. While this is a relevant factor to consider in assessing the appropriate sentence, these repayments in no way undo the damage that Grover inflicted on the PPP by defrauding it of funds that should have gone to eligible small businesses. As was widely reported in August 2021, the PPP ran out of money a full four weeks before its scheduled end and was forced to stop accepting most new applications.[1] By using deception and misrepresentations to obtain millions of federal dollars for which he was ineligible, and which should have been awarded to legitimate, hard-hit businesses, Grover committed a substantial societal harm with real consequences for other individuals.

Lastly, a significant term of imprisonment is also needed to promote respect for the law, provide just punishment for the offense, and deter future unlawful conduct not just from the defendant but also from others inclined to engage in fraudulent schemes that undermine federal programs designed to help struggling Americans in a time of unprecedented crisis. Here, Grover not only inflicted actual losses on the SBA, but also actively undermined the trust underpinning our financial system by teaming up with others to deceive banks in order to lay claim to funds that were intended for qualifying applicants in dire straits. The SBA estimates that there was a total of approximately $64 billion in PPP fraud[2]—and the evidence makes clear that Grover was a significant contributor to that problem. A substantial prison term would send an appropriate message to those who seek to emulate his pursuit of personal gain at public cost.

---

[1] *See* https://www.nytimes.com/2021/05/04/business/paycheck-protection-program-closes.html.

[2] *See* https://www.fbi.gov/contact-us/field-offices/springfield/news/how-the-fbi-is-combatting-covid-19-related-fraud.

## C. Conclusion

Grover was the architect of a massive fraud that undermined a program designed to provide U.S. small businesses, and by extension employees, some relief from the crushing economic hardships of the COVID-19 pandemic. For the reasons set forth above, his conduct warrants a Guidelines sentence of 121-151 months under the Section 3663(a) factors. Because of his substantial income, the Government also agrees with Probation that a fine of at least $35,000 fine is warranted.

Respectfully submitted,

JAY CLAYTON
United States Attorney

by: _____
Jane Y. Chong
Assistant United States Attorney
(917) 763-3172

Cc: Vinoo Varghese, Esq.